IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMOS JONES, et al.,                          *
                                             *
                                             *
                                             *
        v.                                   *        Civil No. JFM-11-00123
                                             *
MAYOR AND COUNCIL OF HURLOCK,                *
        MARYLAND                             *
                                             *
                                             *
                                             *
                                             *
                                          *****

MEMORANDUM

Plaintiffs Amos and Ronald Jones (the "Joneses") and Jones Brothers General

Contractors ("Jones Brothers Contractors") filed this action against the Mayor and Council of

Hurlock, Maryland ("Mayor and Council").[1]  The Joneses, who are African American, allege the

Mayor and Council discriminated against them and their plans to provide affordable housing in

Hurlock because of their race.  The Joneses allege violations of the Fair Housing Act, 42 U.S.C.

§ 3601 *et seq.* ("FHA"), and the Equal Protection Clause of the Fourteenth Amendment.  Now

pending is Defendant's motion for Summary Judgment (ECF No.  34).  For the reasons stated

below, the motion will be granted.  Although there are disturbing allegations that the former

Mayor and some members of the Town Council may have wanted the housing project proposed

by the Joneses not to succeed because it would have resulted in African-Americans residing in

---

[1] The Joneses worked as an unincorporated company called Jones Brothers Contractors until
April of 2010, when they formed a limited liability company and began doing business as Jones
Brothers General Contractors LLC.  (*See* Pl.'s Opp'n to Summ.  J. Ex. A, Dep. of Amos Jones
("A. Jones Dep.") at 11:10–11:16).  Although the initial complaint named Jones Brothers LLC as
Plaintiff, the Second Amended Complaint makes clear the action in this case concerns the
unincorporated entity.  (*See* Second Am. Compl., ECF No. 29).

downtown Hurlock, the evidence, considered as a whole, establishes that the Joneses did not meet reasonable requirements for development and never brought the proposal to fruition.

## I.      BACKGROUND

This case arises from the efforts of Amos and Ronald Jones to purchase property at 56 Mill Street in Hurlock, Maryland (the "property") and develop it into affordable housing.  The Joneses are contractors who work in and around Hurlock, where they grew up and have lived most of their lives.  (Pl.'s Opp'n to Summ. J. Ex. A, Dep. of Amos Jones ("A. Jones Dep."), ECF No. 35–3, at 5:16–10:2, 80:8–84:12, 91:1–91:20).

The Mill Street property was owned by Philip D'Adamo and housed a four-unit apartment building and a detached single-family rental.[2]  (*See* Def. Mot. for Summ. J. Ex. N ("Sept. 11, 2008, Bd. Appeals"), ECF No. 34–15, at 2).  By the time the Joneses expressed an interest in purchasing the property, it had been for sale several months.  (Def. Mot. for Summ. J. Ex. D ("April 14, 2008, Town Meeting"), ECF No. 34–5, at 2).  Other potential buyers appeared reluctant to invest in the property after the city advised them that only a two-inch waterline served the entire property.  (*Id.*).

The Joneses wanted to purchase the property and create affordable housing, which at least once city official agreed is needed in Hurlock.  (A. Jones Dep. at 39:1–42:12; Pl.'s Opp'n to Summ. J. Ex. D, Dep. of Charles Cephas ("Cephas Dep."), ECF No. 35–6, at 49:14–51:16).  They proposed demolishing the existing apartments and building townhouse-style units for low-income families.  (Def.'s Mot. for Summ. J. Ex. I ("May 12, 2008, Town Meeting"), ECF No.

---

[2] D'Adamo is also known as Phillip Adams, a name he used as a radio announcer for a local station.  (*See* Def.'s Mot. at 5 n.9; Def.'s Mot. for Summ. J. Ex. A, Dep of Linda Nabb ("Nabb Dep."), at 21:2–21:7).

34–10, at 1–2).  The units would begin as rentals but after several years the tenants would be

given an opportunity to purchase their residences for $140,000 to $150,000 and receive help with

closing costs.  (*Id.* at 2).  This plan was not definite, however, as the Joneses never finalized a

business plan and Amos testified that it "[w]asn't defined exactly what we [were] going to do,"

but that the "[m]ain thing was just to get the site control of this property. And then get other

fundings."  (A. Jones Dep. at 40:16–41:18).  Over the course of eleven months, the Joneses

signed two contracts to purchase the property, but both contracts fell through.

 The Joneses began this process in April 2008.  Amos Jones attended a meeting of the

Mayor and Town Council on April 14, 2008, to discuss his development plans for the property.

(April 14, 2008, Town Meeting at 2–3).  Hurlock's zoning administrator, Linda Nabb, requested

an opportunity to work with him to develop a concrete proposal, including the installation of an

eight-inch waterline.  (*Id.* at 2–3).  The brothers were encouraged by the response of Hurlock's

Mayor, Donald Bradley, who said he supported the project "in concept."  (*Id.*).  The next day,

Amos Jones, Ronald Jones, and Jones Brothers entered into a contract to purchase the property

for $220,000.  (Def.'s Mot. for Summ. J. Ex. E ("First Contract"), ECF No. 34–6 at 1–2).

Settlement was to occur within 15 days of the Joneses receiving a commitment letter from

Provident State Bank.  (*Id.* at 3).  The contract did not require the Joneses to apply for a

mortgage from that bank until they received "approval by the town of Hurlock."  (*Id.*).

 From the beginning, the Joneses were willing to pay to improve the water and sewer lines

serving the property.  (Def.'s Mot. for Summ. J., Ex. A, Dep. of Linda Nabb ("Nabb Dep."), ECF

No. 34–2, at 39:14–40:8).  Nabb estimated those costs at $392,500.  (Def.'s Mot. for Summ. J.,

Ex. F, ECF No. 34–7, at 3).  At the May 12, 2008 meeting of the Mayor and Town Council,

Amos Jones provided a written proposal for the $2.8 million project, including an impact study,

proposed floor plans, project purpose information, and copies of contractor licenses and

references.  (May 12, 2008, Town Meeting at 1–2).  Nabb told officials the project would create

revenue for the town, including more than $16,000 per year in property taxes, more than $12,000

per year in water and sewage fees, and one-time water and sewer fees of between $150,000 and

$200,000.  (*Id.* at 1).

Amos appeared again at the Mayor and Town Council's May 27, 2008, meeting to submit

a site plan drawing and a more detailed report.  (Def.'s Mot. for Summ. J., Ex. J, ECF No. 34–

11, at 2–3).  Nabb explained the project did not need Council approval yet, but the Joneses

wanted to know if the Mayor and Council "would like to see" the project developed.  (*Id.* at 2).

Nabb stated the "next step is for the Board of Appeals to consider both a Special Exception on

the use of the property for multi-family and a variance on the number of units they are seeking."

(*Id.* at 2–3).  The Joneses aver this was the first time they learned they would need a special

exception and a variance.  (Pl.'s Opp'n at 9).  Nabb, however, testified she told the Joneses they

could start the process for obtaining a special exception and a variance without seeking approval

from the Mayor and Council.  (Nabb Dep. at 33:14–33:19).  Before the Joneses began that

process, Nabb wrote a confidential memorandum to Town officials highlighting concerns about

the size of the project and suggesting the Town trade the Joneses one of two properties on the

outskirts of town, which they could develop into affordable housing instead of the property on

Mill Street.  (Pl.'s Opp'n to Summ. J. Ex. E, ECF No. 35–7).   The Joneses would have to agree

to any trade, but unlike the Mill Street property, the properties Nabb identified did not require

zoning changes to accommodate a large number of residential units.  (*Id.*).   Nothing appears to

have come from that proposal, however, and the Joneses argue the suggestion of a trade is further

evidence Town officials did not want the project to proceed.  (*See* Pl.'s Opp'n at 9–10).

Hurlock's Board of Appeals decides zoning issues, including whether to grant special exceptions and variances, and often receives a recommendation on such requests from the Town's Planning Commission.  (*See* Nabb Dep. at 12:11–12:14, 16:5–17:2, 18:7–18:15).   On July 3, 2008, the Planning Commission recommended the Board of Appeals "closely examine issues pertaining to density, parking area, and green space before making a determination to approve the requests [by the Joneses] for the special exception and variance."  (Def.'s Mot. for Summ. J. Ex. L, ECF No. 34–13, at 2–3).   The Board of Appeals did not hear the issue until September 11, 2008, four days before the Joneses' deadline to close under the first contract.[3] (Sept. 11, 2008, Bd. Appeals at 1–5).   At the meeting, Nabb told officials that Amos was involved in a state court judgment that had not been paid, information apparently given to her by then-councilwoman Joyce Spratt.  (*Id.* at 2–3; Nabb Dep. at 75:4–77:21).   A member of the American Legion read a letter in opposition to the project, citing concerns about parking.  (Sept. 11, 2008, Bd. Appeals at 3).   At the end of the meeting, the Board of Appeals granted the special exception and variance, but on the condition that both were limited to Jones Brothers and were not transferrable to other persons or entities.  (*Id.* at 5).   The Joneses aver the condition prevented them from partnering with investors on the project.  (A. Jones Dep. at 70:13–72:21).   Amos Jones testified that he would not have gone through with the first contract because of the condition.  (*Id.*).

The first contract became void after the Joneses failed to secure financing before the settlement deadline.  Nabb notified town officials in a Sept. 17, 2008 memorandum that the

---

[3] The first contract originally stated settlement would occur 15 days after the Joneses received financing for the project, which they were not required to obtain until they received approval from the town.  (First Contract at 3).  An addendum signed in July, however, required the Joneses to be ready for settlement on or before September 15, 2008, and to produce a letter guaranteeing financing by August 15, 2008.  (*Id.* at 9).

contract of sale "fell thru" and that Jeff Fletcher, a property owner adjacent to the property, "is purchasing about ¼ acre of this land to add onto his property."  (Pl.'s Opp'n to Summ. J. Ex. H, ECF No. 35–10).  Nabb stated the sale to Fletcher nullified the approval of the special exception and variance to the Joneses.  (*Id.*).  The Joneses argue Town officials pressured D'Adamo into selling the property to Fletcher, who owned a nearby car repair shop.  (Pl.'s Opp'n at 25). Cephas, the council president, said Adams [4] told him that council members including Councilman Mills, told him to "sell [the Mill Street property] to the repair shop."  (Cephas Dep. at 44:16–45:3).

Throughout this process, opposition to the project grew.  Cephas, the council president, said some members of the local American Legion opposed the project, which was directly across from its building, because "they did not want African Americans in that vicinity."  (Cephas Dep. at 16:12–17:6; *Id.* at 18:19–19:5).  Cephas also testified that some town councilmen shared these feelings, although he did not elaborate on this statement.  (*Id.*).

Months after the first contract fell through, Charles Adams, the real estate agent who represented both D'Adamo and the Joneses approached the Joneses about acquiring the remaining property.  (*See* A. Jones Dep. at 59:18–60:19; 74:19–6).  On December 23, 2008, the Joneses entered a second contract to purchase the remainder of the Mill Street property, including all five rental units, for $100,000.  (Def.'s Mot. for Summ. J. Ex. S ("Second Contract"), ECF No. 34–20 at 1–2).  The second contract set a deadline for settlement of February 28, 2009.  (*Id.* at 3).  As part of the second contract, D'Adamo disclosed to the Joneses that town officials had on October 21, 2008, ordered him to repair or vacate the apartments

---

[4] It is unclear if Cephas intended to refer to property owner Philip D'Adamo, who is sometimes referred to as Philip Adams, or to Charles Adams, a realtor.  *See* n.2, *supra*.

within 60 days. (*Id.* at 8, 21). The Joneses acknowledged that this time had expired and in the contract they assumed "all risks for Town of Hurlock actions since owner did not meet [the] requirements." (*Id.*).

Nonetheless, the Joneses retained a new financing company and its president, Alton Bivins, provided a letter on January 4, 2009, approving the Joneses' application for a $99,500 loan to purchase the property, subject to several conditions. (Def.'s Mot. for Summ. J. Ex. T, ECF No. 34–21, at 1). As Bivins worked to finalize the underwriting for that loan, he had a series of exchanges with Adams, the dual real estate agent. (*See* Pl.'s Opp'n to Summ. J. Ex. I ("Bivins-Adams Emails"), ECF No. 35–11). Adams wanted the settlement moved up, as another agent wanted the contract thrown out so another buyer could purchase the property, and the Mayor and Council expressed "a lot of bad feelings" about the project at a recent meeting. (*Id.* at 1.). Bivins told Adams that if the property were condemned the loan request would be complicated, because it would need to be changed from an investment project to a development project. (*Id.* at 3). Bivins also expressed his opinion that it "appear[ed] as though . . . every effort to sabotage this deal is being made." (*Id.*).

The settlement date was pushed back to March 18, 2009, under an addendum. (Second Contract at 11). The addendum also provided that no more extensions would be granted. (*Id.*). The reason for this change is disputed. Amos testified that D'Adamo told him that Nabb told D'Adamo not to grant any more extensions. (A. Jones Dep. at 35:18–36:4). Cephas also testified that D'Adamo told him he received calls from members of the Council "asking him to renege on the sales contract." (Cephas Dep. at 40:14–41:5). D'Adamo, however, stated in an affidavit that at "no time was I pressured or coerced by anyone with respect to my intention to

sell The Property to The Buyers."  (Def.'s Mot. for Summ. J. Ex. P ("D'Adamo Aff."), ECF No. 34–17, at 2).

Because the special exception and variance the Joneses received in pursuing the first contract were nullified by the partial sale of the property to Fletcher, the Joneses applied for zoning approval again after entering the second contract.  On March 4, 2009 the Planning Commission recommended the Board of Appeals grant the Joneses a special exception and two variances, on the condition that settlement and loan approval for construction be accomplished no later than 90 days from the hearing.[5]  (Pl.'s Opp'n to Summ. J. Ex. J, ("March 4, 2009, Planning Comm'n"), ECF No. 35–12, at 2).  The Board of Appeals heard the application on March 12, 2009, six days before the settlement deadline.  (Def.'s Mot. for Summ. J. Ex. R ("March 12, 2009, Bd. Appeals"), ECF No. 34–19).  At the hearing, Amos represented that "it was his understanding financing was there."  (*Id.* at 6).  The Board of Appeals granted the special exception and two variances on the 90-day condition recommended by the commission.  (*Id.* at 8).[6]  Nabb testified that other zoning cases involved "time limits," although she could not recall if any were 90 days.  (Nabb Dep. at 95:17–100:11).  Nabb also testified that the Board did not discuss with her the reasons it imposed the 90-day condition, or why it did not impose the non-transfer condition initially imposed.  (*Id.* at 99:6–99:17).

The second contract fell through when the Joneses failed to obtain financing before the settlement deadline.  Bivins could not obtain financing because the "complexion of the loan changed"—an apparent reference to the property's condemnation—and "the terms of the

---

[5] The Planning Commission also discussed the judgment against Amos Jones, which the Joneses argue violated their rights.  (*See* March 4, 2009, Planning Comm'n at 1).

[6] The Joneses—objecting to the 90-day condition—appealed the decision to the Circuit Court for Dorchester County, but that appeal was dropped for a lack of standing after the settlement deadline was missed.  (Pl.'s Opp'n at 16 n.6; *see also* A. Jones Dep. at 74).

commitment were not adhered to and [the Joneses'] request was ultimately denied."  (Def.'s

Mot. for Summ. J. Ex. X ("Bivins Aff."), ECF No. 34–25).  Two weeks later, Fletcher entered a

contract to purchase the remaining property for $80,000.  (Def.'s Mot. for Summ. J. Ex. Y, ECF

No. 34–26).  Amos Jones, angered by what he believed to be disparate treatment, attended the

Town meeting on March 23, 2009, to complain.  (Def.'s Mot. for Summ. J. Ex. M, ("March 23,

2009, Town Meeting"), ECF No. 35–14, at 3–5).  At the meeting, Amos told Town officials he

knew that council members attempted to influence members of the Board of Appeals against his

zoning applications, encouraged the Board of Appeals to improperly use credit issues against the

project, urged Fletcher to purchase the property to block the Joneses' project, and that a Town

official had approached a real estate agent to discuss the Joneses' credit.  (*Id.* at 4).  Only Nabb

responded to the complaints.  (*Id.*).  She stated to her knowledge no council member or Town

employee attempted to influence the Board of Appeals or Fletcher.  (*Id.* at 4–5).

        Months later, Amos Jones talked with the newly-elected Mayor, Joyce Spratt, at a local

Octoberfest.  (A. Jones Dep. at 91:17–92:4).  Jones said Spratt told him the previous mayor,

Bradley, did not support the project because he did not want "all the blacks living downtown."

(*Id.*).  Spratt disputes this, and testified she made no such statement.  (*See* Def.'s Reply Summ. J.

Ex. 1, Dep. of Joyce Spratt ("Spratt Dep."), ECF No. 36–1, at 41: 12–43:12).  Shortly after this

encounter, Amos began attending Town meetings to complain.  (*See* Pl.'s Opp'n Summ. J. Ex.

M, ECF No. 35–15; Pl.'s Opp'n Summ. J. Ex. O, ("Dec. 14, 2009, Town Meeting"), ECF No.

35–16).  At the December 2009 meeting, in which the newly-elected council was seated,

councilman Cephas told Jones it would "be unfair to plunge the new council into the issue at this

time."  (Dec. 14, 2009, Town Meeting).  Cephas also promised the new council "will treat Mr.

Jones fairly and will not [put him] on the back burner as the previous administration had done."
(*Id.*; Cephas Dep. at 53:5–55:4).

After Amos's appearances at Town meetings, Town officials met with both Jones
brothers at a special work session to discuss their grievances and goals.  (Def.'s Mot. Summ. J.
Ex. AA ("Jan. 4, 2010, Work Session"), ECF No. 34–28).  During the work session, Amos and
Ronald expressed their desire to move forward with an affordable housing project in Hurlock.
(*Id.*).  Mayor Spratt emphasized that the Joneses "did not have any money for a project."  (*Id.*).
Spratt said that if the Joneses came to the Town and identified the property they were
purchasing, they could move forward, but Amos said that it was "unfair to ask us to buy
property."  (*Id.*).  Amos also stated that that "stipulations" had been placed on him in the prior
project because of "the color of his skin."  (*Id.*).  At the work session, Cephas stated that "no one
on the Council was looking at the color of Mr. Jones' skin."  (*Id.*).   But at his later deposition,
Cephas stated the prior council had made decisions "based on the color of skin."  (Cephas Dep.
at 61:8–62:6).  Later in his testimony, however, Cephas said his comment was "distinctly about
Councilman Mills and there was hate for the project. I'm not even going into the skin color.
There was hate for the project."  (*Id.* at 94:11–94:21)

The Joneses allege the new Town council retaliated against them by prohibiting them
from discussing their hope to bring affordable housing to Hurlock.  (*See* Pl.'s Opp'n at 18).
After filing the present lawsuit, Amos was denied participation at Town meetings.  (Pl.'s Opp'n
Summ. J. Ex. O, ECF No. 35–17, at 3–4; Pl.'s Opp'n Summ. J. Ex. P ("Banner Article"), ECF
No. 35–18).  When asked why Amos was not allowed to speak, town attorney Hugh Carter
Vinson cited the Joneses' lawsuit against the town.  (Banner Article at 1).  In the letter to Amos
denying his request to speak, however, Spratt told Amos his request was denied because he is not

a resident of the Town and because "part of your request regarding speaking on 'what is going on in town' is not a municipal question," the Town charter "precludes [his request] to be on the agenda." (Def.'s Reply Summ. J. Ex. 2, ("Dec. 8, 2010, Spratt Letter"), ECF No. 36–2). However, Spratt told Amos that if his "intent to talk about affordable housing rental property is a new issue [he is] welcome to speak on that topic as it does concern the municipality." (*Id.*).

## II.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a party may seek summary judgment on each claim or defense or part thereof.  Summary judgment should be rendered when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  Whether a fact is material depends on the substantive law.  *See id*.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met that burden, the non-moving party must demonstrate that such an issue does, in fact, exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore*

11

*Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e));

*see also Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988).

The court must view all facts and draw all reasonable inferences in the light most

favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007). However,

hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a

motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of

Greensboro*, 64 F. 3d. 962, 967 (4th Cir. 1995).

III.     STANDING

As an initial matter, the Town argues Plaintiffs lack standing to pursue these claims

because there is no evidence they suffered an injury as a result of the Town's actions. (Def.'s

Mot. for Summ. J. at 17–20). They argue that because the Board of Appeals granted Plaintiffs'

zoning requests there is no causal connection between the Town's actions and the Plaintiffs'

loss. (*Id.*). Moreover, they note that the reason Joneses' project failed is because the Joneses

could not secure financing, which they aver was not related to Town actions. (*Id.*).

Reading the facts in the light most favorable to Plaintiffs, however, they can be read to

allege an injury caused by Town actions. Plaintiffs allege both economic losses and stigmatic

injury. Stigmatic injuries are recognized as injuries-in-fact under the FHA and are sufficient to

confer standing. *See Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 208 (1972) (holding

plaintiffs who alleged, *inter alia,* that defendant's discriminatory practices "stigmatized [them] as

residents of a white ghetto" had standing under the FHA).[7] Even if this were not the case,

however, Plaintiffs claim can be read to allege a cognizable economic injury, because they claim

---

[7] Although the Supreme Court has limited *Trafficante's* language insofar as it was applied to
Title VII cases, it remains applicable in Title VIII cases. *See Thompson v. North Am. Stainless,
L.P.*, 131 S. Ct. 863, 869 (2011).

Town officials both pressured D'Adamo into refusing to extend the settlement deadline for the second contract and imposed a condition on the zoning approval that required Plaintiffs to settle within 90 days.   Thus, Plaintiffs have standing to pursue their claims.

IV.    FAIR HOUSING ACT

The FHA makes it unlawful to "otherwise make unavailable or deny" a dwelling to any person because of race or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. §§ 3604(a)&(b).  The Fourth Circuit has held Plaintiffs can recover for unlawful discrimination in violation of the FHA either because an action was motivated by a racially discriminatory intent or because it had a disparate impact on minorities.  *See Betsey v. Turtle Creek Assoc's*, 736 F.2d 983, 986 (4th Cir. 1984) (citing *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1972)).   In this case, Plaintiffs claim discriminatory intent.  (Second Am. Compl. ¶¶ 29–30).

A.  Standard

The parties analyze this claim under different standards.  Defendants utilize the four-prong approach established in *Town of Clarkton*, 682 F.2d at 1065, which provides the test for discriminatory zoning claims against municipal governments.  However, *Town of Clarkton* has largely been applied in cases alleging disparate impact, unlike the discriminatory intent claim here.  *See, e.g.*, *Town of Clarkton*, 682 F.2d at 1065 (adopting factors announced in *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)); *Potomac Grp. Home Corp. v. Montgomery Cnty., Md.*, 823 F. Supp. 1285, 1295 (categorizing *Town of Clarkton* as the test for "whether a housing practice has a disparate impact in violation of federal law").  In

contrast, Plaintiffs appear to treat *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), commonly used in evaluating claims of discriminatory intent, as controlling.

I need not decide whether the Fourth Circuit would apply *Town of Clarkton* to a claim alleging only discriminatory intent, however, because I find Plaintiffs' claim fails under both *Town of Clarkton* and *McDonnell Douglas*.

B.  Analysis

a.  *Town of Clarkton*

*Town of Clarkton* provides four factors for analyzing FHA claims against municipal governments.  *Town of Clarkton*, 682 F.2d at 1065.  They are:

> 1) how strong is the plaintiff's showing of discriminatory effect, 2) is there some constitutional evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis*;  3) what is the defendant's interest in taking the action complained of; and 4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

i.  First Factor: Disparate Impact

There are two forms of disparate impact: 1) a facially neutral decision that has a greater adverse impact on one race than on another, and 2) a facially neutral decision that perpetuates segregation and thereby prevents interracial association in the community.  *See Edwards v. Johnston Co.  Health Dept.*, 885 F.2d 1215, 1223 (4th Cir. 1989).

In this case, the first type of disparate impact cannot apply, because in such cases the "correct inquiry . . . is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Turtle Creek Assoc's*, 736 F.2d at 988. The zoning conditions at issue in this case were imposed only on the Joneses, both of whom are African-American. Because the zoning condition was not imposed on both African-Americans and non-minorities, this first type of disparate impact cannot exist.

Although it is possible the Town's actions perpetuated segregation in a way recognized by the second type of disparate treatment, the Joneses provide little evidence or argument to support such a claim. Indeed, the only relevant evidence in the record is Cephas's deposition testimony that residents of the three current low-income housing communities in Hurlock are "predominately" African-American. (Cephas Dep. at 50:21–51:16). This statement is far short of the statistical evidence often used to demonstrate a disparate impact. *See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (observing that "[t]ypically, 'a disparate impact is demonstrated by statistics'" (quoting *Hallmark Developers, Inc., v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006))). Plaintiffs also fail to address whether the area around the Mill Street property was predominately non-minority, such that preventing the Joneses from developing low income housing on the property actually perpetuated segregation. Accordingly, this factor does not support Plaintiffs' claim.

### ii.   Second Factor: Discriminatory Intent

Plaintiffs do present evidence of discriminatory intent. Plaintiffs allege the Town took actions to "kill" their project even though the Council said it "approve[d] the concept." (*See* Pl.'s Opp'n at 23 (quoting Cephas Dep. at 97:7–10)). Those actions include: 1) discussing the

creditworthiness of Plaintiffs, 2) the Town's efforts to condemn the property, which occurred between the time of the first and second contracts, 3) alleged interference by Town officials with the contracts of sale, 4) Town efforts to move the project to the outskirts of Town, 5) Conditions imposed on the special exceptions and variances granted to Jones Brothers.  (Pl.'s Opp'n at 23–27).

The Joneses present some evidence supporting their argument that these actions were motivated by a discriminatory intent, although as discussed below and in section IV.B.b, *infra*, this evidence is insufficient.  The Joneses rely on the statements by Cephas that the prior council made decisions "based on the color of skin" and Amos's testimony that Mayor Spratt told him that former Mayor Bradley opposed the development because he did not want "all the blacks living downtown."  (Cephas Dep. 61:8–62:6; A. Jones Dep. at 91:17–92:4).  This is not enough to defeat the motion for summary judgment.  Amos's testimony about Spratt's statement contains several layers of hearsay, and is also disputed by Spratt.  (*See* Def.'s Reply Ex. 1, Spratt Dep. at 41:8–43:11).  Cephas's testimony, while not hearsay, is conculsory and when asked to explain the statement, his answer appeared to change.  (*See* Jan. 4, 2010 Work Session, ECF No. 34–28 (quoting Cephas as saying that no one on the council "was looking at the color of Mr. Jones' skin"); Cephas Dep. at 94:17–21 (referring to earlier statement and saying "I'm not even going into the skin color. There was hate for the project.")).

In addition, the Joneses allege the conditions placed on their zoning approval were discriminatory.  When the Board of Appeals first granted approved zoning changes for the Joneses' project, it imposed a non-transfer condition.  (Sept. 11, 2008, Bd. Appeals at 5).  When the Board of Appeals granted zoning approval a second time, it imposed the condition that the Joneses secure financing within 90 days.  (March 12, 2009, Bd. Appeals).  Although the Joneses

aver these conditions were motivated by invidious discrimination, the record provides little basis for this contention.  There is no evidence suggesting Town officials knew the Joneses intended to sell the property to an investor, or that they knew timely financing could not be obtained.  Indeed, Amos represented to the Board that financing was in place.  (*Id.*).  The Joneses point out that Nabb could not recall a 90-day limitation being placed on any other projects—inferring that such conditions are unprecedented—however Nabb made clear that conditions were imposed on other construction projects, including time limitations of varying lengths.  (Pl.'s Opp'n at 16; Pl's Opp'n to Summ. J. Ex. K, Dep. of Linda Nabb., ECF No. 35–13, at 97:7–98:17).

The other actions Plaintiffs challenge do not lend support to their intentional discrimination claim.  While it is clear Town officials discussed a judgment against Amos, there is no basis to infer the officials did so for a reason other than their concern about the project's financing.  (Nabb Dep. at 74:14–77:21).  Plaintiffs' argument that the Town instituted condemnation proceedings because of racial animus also has no evidentiary basis.  The Town began the condemnation process after the Joneses' first contract on the property fell through, and before the Joneses were approached about the possibility of pursuing a second contract.  (*See* Second Contract at 25 (noting that on Oct. 21, 2008—more than a month after the first contract fell through and two months before the Joneses entered the second contract—that D'Adamo was told to bring the property up to code or vacate it)).  There is therefore no way Town officials could have initiated the process with an intent to discriminate against the Joneses, because at the time those proceedings were initiated it appeared the Joneses were no longer interested in purchasing the property.  (*Id.*).  Plaintiffs' bare allegations to the contrary are simply not enough to sustain their claim.  Nor do they present evidence to infer that Nabb's memorandum to Town

officials suggesting the Town trade the Joneses a property for them to develop on the outskirts of town was racially motivated.

Plaintiff's final argument is that Town officials attempted to interfere with their contract for the property, by urging the seller not to extend the settlement deadline. Both Amos and Cephas testified that D'Adamo told them he received calls from members of the council asking him to either renege on the sales contract or to refuse any more extensions of the settlement date. (A. Jones Dep. at 35:18–36:4; Cephas Dep. at 40:14–41:5). However, that testimony is contradicted by D'Adamo's affidavit stating that he was not pressured or coerced about the potential sale. (D'Adamo Aff. at 2). The hearsay statements by Amos and Cephas are not enough to create a material dispute on this issue. Accordingly, this factor provides little support for Plaintiffs' claim.

### iii.  Third Factor: Town's Interests

The Town of Hurlock argues it had two primary motives: 1) "the very real concern that Plaintiffs would not be able to carry through their project once begun" and 2) "Plaintiffs statements to the Board and Town Council that 'financing was in place' and that 'construction would begin in the second quarter of 2009.'" (Def.'s Mot. at 24).

Given the deteriorating condition of the property, it appears that the Town had a legitimate interest in ensuring the health and welfare of residents by ensuring the development occurred shortly after it approved zoning for the project. *See, e.g.*, *R.J. Investments, LLC. v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, No. RDB-07-1903, 2010 WL 988833, at *5 (D. Md. March 15, 2010) (finding public safety, health, and welfare legitimate government interests); *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 278 (4th Cir. 2011) (observing that "'issue[s]

such as the concern over further growth . . . , the consequences of increased residential density, and the preservation of [a] community's aesthetic character' are, appropriately, 'at the heart of countless local zoning disputes.'"   (quoting *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 829 (4th Cir. 1995)).   Moreover, municipalities are traditionally afforded wide discretion in zoning matters.   *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 5–6 (1974).

The Joneses argue the Town's reasons are pretextual.   The Joneses assert, somewhat circuitously, that "[i]f Plaintiffs had received funding for the redevelopment project, Defendant would have no rational or legitimate concern whether Plaintiff could fund the project."   (Pl.'s Opp'n at 29).   Plaintiffs' argument appears to be that because they told the Board financing was in place, the Board had no reason to impose finance-related conditions.   (*Id.*).   Such an argument is unconvincing, because the Board may well have had legitimate concerns about the Joneses' representation that financing was indeed in place.   The Joneses also argue the Town's reaction to this lawsuit is evidence that the Town discriminated against the Joneses, because now Amos has not been allowed to discuss affordable housing at Town meetings.   (*Id.*).   But the letter from Mayor Spratt to Amos states that if he intends to speak about new issues regarding affordable housing, he is welcome to do so.   (Dec. 8, 2010, Spratt Letter).   It appears the Town merely seeks to keep Amos from using Town meetings to discuss the failed project.   (*See id.*).

This evidentiary record demonstrates the Town had legitimate non-discriminatory reasons to impose conditions on the zoning approval.   Accordingly, this factor weighs against Plaintiffs' claim for relief.

                  iv.   Fourth Factor: Whether Plaintiffs seek to Compel the Defendant to Affirmatively Provide Housing for Minorities or Merely Restrain the Defendant from Interfering with Individual Property Owners Who Wish to Provide Minority Housing

The fourth *Town of Clarkton* factor examines the relief Plaintiffs seek.   This factor is difficult to apply in this case because although Plaintiffs sought to buy the property, they never completed the purchase and the property has now been put to other use.   The Town therefore argues the factor is irrelevant, because the factor is phrased in terms of the relief sought by property owners, and the Joneses never owned the property.   (*See* Def.'s Mot. at 25).   This argument proves too much, however, because even if the Joneses did not complete the purchase, they undertook the zoning process in the same manner a property owner would have.

Indeed, it is clear that the Joneses sought to restrain the Town from interfering with their ability to develop the property, rather than to affirmatively compel the town to provide housing. In *Arlington Heights*, from which the Fourth Circuit adopted the *Town of Clarkton* framework, the Seventh Circuit treated a Plaintiff's request for rezoning in order to develop property as a situation where the municipality was asked not to interfere with the rights of property owners, not one in which the plaintiffs sought to compel the municipality to provide housing.   *Arlington Heights*, 558 F.2d. at 1293.   *Cf. Town of Clarkton*, 682 F.2d at 1066 (noting this factor weighed in Plaintiffs' favor because they did not "seek injunctive relief which would require Clarkton to build public housing from its own treasury.").   This distinction is important because, as the Seventh Circuit noted:

> To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy.   By contrast, the courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing.

*Id.* at 1285.

Thus, this factor would support awarding appropriate relief to Plaintiffs.

### v.   Conclusion

In the final analysis, the *Town of Clarkton* factors weigh against Plaintiffs' claim.   There is no evidence of disparate impact, there is little admissible evidence of discriminatory intent, the Town appeared to have legitimate reasons for its actions, and although Plaintiffs do not seek to compel the Town to build affordable housing itself, that fact alone cannot tilt the analysis in favor of Plaintiffs.   Therefore, under the *Town of Clarkton* analysis, Defendants are entitled to summary judgment.

### b.  *McDonnell Douglas*

I would reach the same result even if *Town of Clarkton* did not apply, and this case were analyzed only under the *McDonnell Douglas* burden-shifting framework.   Under this analysis, Plaintiffs can survive summary judgment on a discriminatory intent claim in two ways.   First, they can offer direct evidence of intentional discrimination, sufficient to defeat the motion.  *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 437 (E.D. Va. 2011) (vacated in part on other grounds, 2012 WL 626460). Second, if they have no direct evidence of discrimination, Plaintiffs can use the burden-shifting framework of *McDonnell Douglas*.  *See Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1452 (4th Cir. 1990).    In this case, Plaintiffs cannot withstand the motion for summary judgment under either approach.

Plaintiffs present two statements that could be considered direct evidence of discrimination.   These are Amos's testimony that Mayor Spratt told him that former Mayor Bradley opposed the development because he did not want "all the blacks living downtown," and

Cephas's testimony that the previous Council had made decisions "based on the color of skin."

(A. Jones Dep. at 91:17–92:4; Cephas Dep. at 61:8–62:6).  As noted above, however, Amos's

testimony about Spratt's statement contains several layers of hearsay, and is disputed by Spratt.

(*See* Spratt Dep. at 41:8–43:11).  Cephas's testimony, while not hearsay, appears to change

throughout the record and this portion of his testimony is conclusory.  (*See* Jan. 4, 2010 Work

Session (quoting Cephas as saying that no one on the council "was looking at the color of Mr.

Jones' skin"); Cephas Dep. at 94:17–21 (referring to earlier statement and saying "I'm not even

going into the skin color. There was hate for the project")).  This is simply not sufficient direct

evidence to defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n*,

*Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995); *Antonio v. Sec. Serv's of

Am., LLC*, 701 F. Supp. 2d 749, 758 (D. Md. 2010) (noting that "hearsay statements or

conclusory statements with no evidentiary basis cannot support or defeat a motion for summary

judgment.").

    Although Plaintiffs' circumstantial evidence is stronger than their direct evidence, it is

still insufficient to permit Plaintiffs to withstand the summary judgment motion.  To establish a

prima facie case of discrimination, a plaintiff must show that a discriminatory purpose was a

motivating factor, although not the dominant or primary purpose.  *Matarese*, 795 F. Supp. 2d at

430–31 (citing *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 201 F.3d 781, 791 (6th Cir.

1996)).  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory

rationale for the challenged action.  *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 564 (E.D.N.Y.

2007).  If the defendant meets that burden, the presumption of discrimination disappears from the

case and the burden shifts back to the plaintiff to demonstrate that discrimination was the real

reason for the defendant's action, by showing, for example, that the proffered reasons were

pretextual.  *Id.*  Plaintiffs maintain the ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against him or her.  *Id.*

The elements of a prima facie case of discrimination are flexible and vary from case to

case, depending on the circumstances.  *See U.S. v. Badgett*, 976 F.2d 1176, 1178–79 (8th Cir.

1992).  In cases involving municipal land use restrictions, courts have typically required

plaintiffs to prove they were qualified to receive approval for their project as part of the prima

facie case.  *See, e.g., Sanghvi v. City of Claremont*, 328 F.3d 532, 536 (9th Cir. 2003) (requiring

proof plaintiff was qualified to receive sewer connection); *Gamble v. City of Escondido*, 104

F.3d 300, 305 (9th Cir. 1997) (requiring plaintiff to prove he was qualified for a conditional use

permit); *Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1314 (M.D. Ala. 1999) (applying the

standard used in *Gamble*, and finding no discrimination in part because "there is no evidence that

the City had approved an application with the scope and type of deficiencies that blemished the

plaintiffs' application").  *Cf. Mobley v. Rossell*, 297 F. Supp. 2d 835, 838–39 (D. Md. 2003)

(requiring plaintiff alleging discrimination for refusal to sell her property prove she was qualified

to buy property on the seller's terms); *Frison v. Ryan Homes*, No. Civ. A.AW-04-350, 2004 WL

3327904, at *5 (D. Md. 2004)  (finding plaintiffs failed to make a prima facie case because they

did not show they were qualified to buy property or qualified to obtain a loan).

In this case, the Joneses actually received zoning approval for their project, but they

allege the conditions placed on that approval were discriminatory.  Accordingly, to state a prima

facie case the Joneses must show: 1) they are members of a protected class, 2) they applied to

and were qualified to receive the zoning exceptions they sought, without the conditions imposed

by the Town, 3) they were rejected, and 4) the opportunity for approval remained available

thereafter.   Because Plaintiffs pursued zoning approval on two occasions—under the first

23

contract, then under the second contract—both occasions will be analyzed.  In each, however, the only dispute is if Plaintiffs were qualified to receive the zoning approval they sought without the conditions imposed by the Town.

Plaintiffs claim the non-transfer condition on the first zoning approval prevented them from selling the property to a partner who could provide capital for the project.  Plaintiffs provide no evidence, though, that similarly situated zoning applicants are not subject to such conditions.  (*See* Pl.'s Opp'n, at 26).   Nor do they allege as much.  (*Id.*).   Nor do they even provide evidence that Town officials knew the Joneses needed to transfer the zoning approval in order to gain financial backing for the project.  Accordingly, there is no evidence from which a fact-finder could conclude they were qualified to receive zoning approval for the first contract without the limitation the Town imposed.  The Joneses therefore fail to make a prima facie case that they were discriminated against when the Town imposed this condition.[8]

Likewise, there is not evidence the 90-day settlement condition imposed on the second zoning approval was motivated by invidious discrimination.  As discussed earlier, Plaintiffs admit Amos Jones told the Board of Appeals "financing was in place" and there is no evidence in the record suggesting that the Board knew that financing could not be obtained within 90 days.  (*See* March 12, 2009, Bd. Appeals).  The record therefore does not show the Joneses were qualified for zoning approval without this condition.

---

[8] Even were I to find otherwise, the Town has presented a legitimate non-discriminatory reason for the condition: that the Jones Brothers were the only potential buyers willing to pay for the cost of improving the water and sewer lines to the property.  (Def.'s Reply at 6).  Because the special exception and variance the Town granted allowed the Jones Brothers to build a greater number of dwellings on the property than existed, the condition ensured the water and sewer lines were expanded accordingly.

Even were I to find that Plaintiffs made a prima facie case of discrimination, however, I find the Town presented sufficient legitimate non-pretextual reasons, discussed in section IV.B.a., *supra*, to entitle it to summary judgment.  Thus, even assuming Plaintiffs stated a prima facie case, they failed to rebut the legitimate non-discriminatory reasons presented by the Town. Defendant's motion for summary judgment on the FHA claim will therefore be granted.

V.      Section 1983

To state a claim under 42 U.S.C. § 1983, a Plaintiff must allege he was deprived of a federal right by a person acting under the color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961)).  In this case, Plaintiffs allege their rights under the equal protection clause of the Fourteenth Amendment were violated because they were discriminated against on the basis of race.  (*See* Pl.'s Opp'n at 30–31).  To state a race-based claim under the equal protection clause, a Plaintiff need not allege discrimination was the sole motive for the challenged conduct, but must "allege the requisite discriminatory intent with more than mere conclusory assertions."   *See Williams v. Hansen,* 326 F.3d 569, 583–84 (4th Cir. 2003).   If a plaintiff presents proof that a government defendant's decision was motivated in part by a racially discriminatory purpose, the burden shifts to the defendant to establish, by a preponderance of the evidence, that the same decision would have resulted even had the impermissible purpose not been considered.  *Thompson v. U.S. Dept. of Housing and Urban Development*, 348 F. Supp. 2d 398, 412–13 (D. Md. 2005) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  As noted in section IV, however, Plaintiffs failed to show the Town's actions were motivated at least in part by racial discrimination. Accordingly, their claim under § 1983 fails for the same reason their FHA claim fails.

VI.     Conclusion

        For the reasons given above, summary judgment will be granted in favor of defendants.

A separate order to that effect is being entered herewith.


Date:  August 7,  2012                    ___/s/_____
                                          J. Frederick Motz
                                          United States District Judge